IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BCS INSURANCE COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04 C 3808 |
| | ) | |
| GUY CARPENTER & COMPANY, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff BCS Insurance Company, Inc.'s

("BCS") motion for summary judgment, and Defendant Guy Carpenter & Company,

Inc.'s ("Guy Carpenter") motion for summary judgment.  For the reasons below, we

grant Guy Carpenter's motion for summary judgment in its entirety and deny BCS's

motion for summary judgment.

## BACKGROUND

Insurance Specialists, Inc. ("ISI") sold extended warranty programs to

producers, dealers, and retailers around the country for products such as

automobiles, recreational vehicles, computers, and appliances.  BCS alleges that it

1

was introduced to the ISI program in 1992, by Guy Carpenter's predecessor in interest, H.S. Fox. BCS claims that Guy Carpenter understood that the ISI program would be one-hundred percent insured by a reinsurer who would be responsible for all risk and would administer the program, and that Guy Carpenter would be responsible for negotiating such a reinsurance agreement. BCS also alleges that it was understood by H.S. Fox and Guy Carpenter that BCS would retain no underwriting risk or other risk associated with the ISI program.

BCS alleges that after a few years of participation in the ISI program, BCS agreed to retain a small portion of the risk in the ISI program, but then decided in 1995 to no longer retain any risk in the program. BCS alleges that in 1995, it notified Guy Carpenter that BCS would be terminating its participation in the ISI program at the end of the 1995 reinsurance treaty year. BCS alleges that in late 1995 or early 1996, Guy Carpenter advised BCS that a group of London-based reinsurers would be underwriting the ISI program, undertaking all risk in the program, and that the London-based reinsurers would oversee the program. BCS claims that Guy Carpenter asked BCS to reconsider its decision to terminate its participation in the ISI program, based on Guy Carpenter's assertions regarding the involvement of the London-based reinsurers in the ISI program. BCS agreed to continue its participation in the program, but BCS alleges that BCS and Guy Carpenter both understood that the ISI program would be one-hundred percent reinsured and managed by the London-based reinsurers.

BCS alleges that it subsequently acted as the issuing carrier for the ISI program and the London-based reinsurers for the 1996, 1997, and 1998 reinsurance treaty years. BCS alleges that Guy Carpenter never properly procured the reinsurance for the ISI program as promised to BCS, which BCS claims resulted in liability to BCS. BCS alleges that it informed Guy Carpenter in late 1997 or early 1998 that BCS was terminating its participation in the ISI program and BCS agreed to continue its participation only during a transition period, during which the ISI program would continue to be fully reinsured.

In March 1999, BCS submitted a claim for $36 million to the London based-reinsurers relating to liability from the ISI program. BCS alleges that the claim was paid in full. BCS claims that it was unaware at the time that the London-based reinsurers also conveyed a letter with a reservation of rights provision to Guy Carpenter. BCS alleges that during 1999 and 2000, BCS and the London-based reinsurers communicated only through Guy Carpenter, and BCS alleges that it continued to pay claims under the ISI program. BCS alleges that after the 2000 monthly account, the London-based reinsurers refused to make any additional payments to BCS and demanded arbitration to rescind the reinsurance agreements or, in the alternative, to obtain compensation from BCS for certain loses relating to the ISI program. BCS alleges that in order to toll the statute of limitations on any claims BCS had against Guy Carpenter, BCS and Guy Carpenter entered into a tolling agreement in February 2001.

BCS alleges that it entered into arbitration with the London-based reinsurers. According to BCS, the London-based reinsurers prevailed in arbitration on the claims seeking compensation for certain losses and BCS prevailed on the issue of rescinding the reinsurance contracts. BCS claims that its liability owed to the London-based reinsurers was caused by Guy Carpenter's false representations and Guy Carpenter's failure to properly procure reinsurance. BCS brought the instant action, which includes a breach of contract claim (Count I), a breach of implied contract claim (Count II), a professional negligence claim (Count III), an implied indemnity claim (Count IV), a breach of fiduciary duty claim (Count V), and a negligent misrepresentation claim (Count VI). On September 2, 2005, both BCS and Guy Carpenter filed the instant motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied

by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court must consider the evidence as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson,* 477 U.S. at 255.

## DISCUSSION

### I. Statute of Limitations

Guy Carpenter alleges that Counts I-III and V-VI are barred under 735 ILCS 5/13-214.4 ("Section 13-214.4"), which requires that claims against certain insurance entities be filed within two years of their accrual. BCS, however, argues that Section 13-214.4 does not apply to reinsurance companies such as Guy Carpenter, that the tolling agreement between the parties bars application of the

statute of limitations in this case, and that BCS's claims against Guy Carpenter did not accrue more than two years before the tolling agreement started.

Section 13-214.4 states:

> Actions against insurance producers, limited insurance representatives, and registered firms. All causes of action brought by any person or entity under any statute or any legal or equitable theory against an insurance producer, registered firm, or limited insurance representative concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance shall be brought within 2 years of the date the cause of action accrues.

735 ILCS 5/13-214.4. BCS primarily cites an Illinois Supreme Court case, *In re Liquidations of Reserve Ins. Co.*, 524 N.E.2d 538, 540-41 (Ill. 1988) ("*Reserve Insurance*"), to support its argument that causes of action involving reinsurance companies are not governed by Section 13-214.4. The court in *Reserve Insurance* stated that "[a] reinsurance agreement is different from a policy or contract of direct insurance in both form and substance," and that "when the legislature intended reinsurance to be included within a particular section, 'reinsurance' was explicitly mentioned." *Id.* at 540-42 (citing Illinois statutes that specified that they applied to reinsurance contracts). From these statements, BCS reasons that Section 13-214.4 "only applies to claims concerning 'policies of insurance' and not to claims concerning reinsurance contracts." (Resp. 2).

*Reserve Insurance*, however, involved a different statutory provision than the one in question here, and the case was decided in 1988, three years before the Illinois

legislature passed the Reinsurance Intermediary Act ("Reinsurance Act"), 215 ILSC 100/1 *et seq.* The Reinsurance Act clearly provides that "'Reinsurer' means any person, firm, association, or corporation duly licensed in this State under the applicable provisions of law as an *insurer* with the authority to assume reinsurance." 215 ILCS 100/5 (emphasis added). The Reinsurance Act also states that "[n]o person, firm, association, or corporation that maintains an office, officer, director, agent, or employee, directly or indirectly, in this State shall act as an intermediary broker *unless licensed as an insurance producer* in this State." 215 ILCS 100/10 (emphasis added). Finally, the Illinois Insurance Code, 215 ILCS 5/1 *et seq.*, states that an insurance producer is "a person required to be licensed under the laws of this State to sell, solicit, or negotiate insurance" and that an insurance producer can be licensed to sell a number of types of insurance, including "[a]ny other line of insurance permitted under State laws or rules." 215 ILCS 5/500-10; 215 ILCS 5/500-35. It is clear from the interaction of these statutory provisions that reinsurance was subsumed within the statutory scheme of the Illinois Insurance Act and, thus, reinsurance companies should be considered insurance producers for the purposes of the statute of limitations in Section 13-214.4.

Such a reading of the statute is particularly reasonable given the perverse outcome that would arise if we were to find that claims against reinsurance companies were not included in the two-year statute of limitations. Excluding reinsurance claims from Section 13-214.4 would mean that individual consumers in

Illinois would be required to bring claims against insurance companies in the shortened two-year period, but sophisticated insurance companies, like BCS, would be able to bring their reinsurance claims at a much more leisurely pace. This would make no sense. *See Reserve Insurance,* 524 N.E.2d at 540-541(stating that "reinsurance agreements may be entered into only by and between certain insurance companies" and that "[i]nsurers who negotiate and enter into reinsurance agreements do so from a substantially more equal bargaining position than do policyholders of direct insurance").

BCS makes a last-ditch attempt at avoiding the application of Section 13-214.4 to reinsurance claims by arguing that the version of the Illinois Insurance Code that was in place during the period of time relevant to the instant action contained different language that would change the application of the statute here. Specifically, BCS argues that before January 1, 2002, the Illinois Insurance Code defined an insurance producer as "an individual who solicits, negotiates, effects procures, renews, continues or binds policies of insurance covering property or risks located in Illinois." (Resp. 4)(citing 215 ILCS 5/491.1(b)(2001)). BCS argues that Guy Carpenter is not an "individual," and thus cannot be considered an insurance producer under the earlier version of the Illinois Insurance Code. While the prior version of the Illinois Insurance Code contained no definition of the term individual, it is clear that courts applied the statute to companies such as Guy Carpenter. *See Hobson v. Lincoln Ins. Agency, Inc.,* 2001 WL 55528, at *4 (N.D. Ill. 2001)(applying

the prior version of the Illinois Insurance Code to an insurance agency). Therefore, BCS's argument that the prior version of the Illinois Insurance Code does not apply to the instant action is without merit.

We also find that the actions BCS is complaining about in Counts I-III and V-VI fall within the purview of Section 13-214.4. The statute states that it applies to "[a]ll causes of action brought by any person or entity under any statute or any legal or equitable theory against an insurance producer, registered firm, or limited insurance representative concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance . . . ." 735 ILCS 5/13-214.4. This has been interpreted by the Illinois courts as being "unequivocal and subject to only one reasonable interpretation: that *all* causes of action brought by *any* person or entity under *any* theory against an insurance producer shall be brought within two years of the date the cause of action accrues." *Indiana Ins. Co. v. Machon & Machon, Inc.*, 753 N.E.2d 442,445 (Ill. App. Ct. 2001)(emphasis in original).

In the instant action, Count One involves an alleged breach of contract based on the fact that "Guy Carpenter failed to *procure* [proper] reinsurance" for BCS. (Compl. Par. 39)(emphasis added). Count Two alleges a breach of an implied contract stemming from the alleged fact that Guy Carpenter failed "to *obtain* reinsurance that covered and/or indemnified BCS." (Compl. Par. 47)(emphasis added). Count Three involves alleged professional negligence on the part of Guy Carpenter in relation to its duty to "*obtain*[] reinsurance on BCS' behalf." (Compl.

54)(emphasis added). Count Five asserts a breach of fiduciary duty by Guy Carpenter after it "failed to *obtain* reinsurance" for BCS. (Compl. Par. 70)(emphasis added). Finally, Count six alleges negligent misrepresentation stemming from Guy Carpenter's "representat[ion] to BCS in late 1995 that *it was procuring, or had procured,* reinsurance for BCS." (Compl. Par. 75)(emphasis added). It is clear from the face of the complaint that each of these counts involved the procurement, or non-procurement, of reinsurance coverage and, therefore, they would fall within the coverage of Section 13-214.4.

It is next necessary to determine when the two-year statute of limitations accrued. Under Illinois law, "[f]or contract actions and torts arising out of contractual relationships, the cause of action ordinarily accrues at the time of the breach of contract, not when a party sustains damages." *Indiana Ins. Co.*, 753 N.E.2d at 445-46. This rule is intended to avoid situations where a "plaintiff will delay bringing suit after a contract is breached in order to increase damages." *Id.* With cases involving alleged breaches of a fiduciary duty, however, "a cause of action for breach of that duty accrues at the time of the breach, but the statute of limitations is subject to tolling by application of the discovery rule." *General Cas. Co. of Illinois v. Carroll Tiling Service, Inc.*, 796 N.E.2d 702, 715 (Ill. App. Ct. 2003). Under the discovery rule, the statute of limitations does not start running "until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 633 N.E.2d 627,

630-31 (Ill. 1994). It is not necessary for the plaintiff to "be certain of defendant's negligence before the statute [of limitations] is triggered." *Broadnax v. Morrow*, 762 N.E.2d 1152,1157 (Ill. App. Ct. 2002). The burden is on the plaintiff to prove the date he discovered he had been harmed. *Indiana Ins. Co.*, 753 N.E.2d at 446.

In the instant action, BCS's breach of contract, breach of implied breach of contract, professional negligence, and negligent misrepresentation claims all involve alleged torts arising out of a contractual relationship. Therefore, we must determine the accrual date for these claims by looking at when the contract between BCS and Guy Carpenter was breached, which in each count would have been when Guy Carpenter allegedly failed to negotiate and procure proper reinsurance coverage for BCS in relation to the ISI Program. According to the undisputed facts, "Guy Carpenter prepared, or caused to be prepared, 'cover notes' documenting the agreement between the London Reinsurers and BCS . . . for the 1996, 1997, and 1998 reinsurance treaty years." (Compl. Par. 20-21); (P's Resp. D's SOF Par. 20)(stating that "BCS admits that in 1995 and 1996, H.S. Fox . . . negotiated a new reinsurance placement on behalf of BCS with the London Reinsurers").

Guy Carpenter asserted in its statement that "[a]ny renewals for the [ISI] program were obtained by Guy Carpenter prior to December 31, 1998." (SOF Par. 20). BCS tries to deny this statement by stating that "BCS obtained some of the reinsurance without Guy Carpenter's assistance" and that "Guy Carpenter continued to negotiate the terms and conditions" after the end of 1998. (P's Resp. D's SOF Par.

20). BCS also states that "Guy Carpenter worked on treaty workings throughout 1998 and well into 1999." (Resp. 8). None of this, however, matters for determining the date that Guy Carpenter allegedly breached its contractual obligations to BCS. Even if Guy Carpenter had continued to be an intermediary between BCS and the London-based reinsurers, it is clear that Guy Carpenter, or its predecessor H.S. Fox, had breached its contract with BCS as soon as it improperly negotiated the reinsurance. This could not have been later than the end of 1998. Furthermore, whether Guy Carpenter continued to finalize treaty wording after 1998 does not matter to this determination, given that Guy Carpenter had negotiated a final contract between BCS and the London-based reinsurers once the "cover notes" were in place. *See Sphere Drake Ins. Ltd. v. American General Life Ins.*, 376 F.3d 664, 671 n.4 (7th Cir. 2004)(stating that "[a] reinsurance slip is a contract, in abbreviated form, between the reinsured and the retrocessionaire"). Accordingly, we find that the latest date that Guy Carpenter could have breached its contract with BCS is the end of 1998, which is more than two years before either the tolling agreement was entered or this action was brought, and is beyond the statute of limitations period.

BCS's breach of fiduciary duty claim (Count V) must be analyzed under the discovery rule. As stated above, the Illinois courts have stated that "when an insurance agent owes a fiduciary duty to an insured, a cause of action for breach of that duty accrues at the time of the breach, but the statute of limitations is subject to tolling by application of the discovery rule." *General Cas. Co. of Illinois*, 796

N.E.2d 715(applying the discovery rule to a breach of fiduciary duty claim). In insurance cases such as the instant action, the discovery rule typically tolls the statute of limitations until the plaintiff discovers that his claims have been denied. *Broadnax*, 762 N.E.2d at 1157. However, when applying the discovery rule, it is clear that "a plaintiff need not be *certain* of defendant's negligence before the statute is triggered." *Id.* (emphasis in original). Instead, "the limitations period begins to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Id.*

In the instant action, BCS argues that it "could not have known about its potential claims against Guy Carpenter until September 1999 at the earliest, when the London Reinsurers advised Guy Carpenter of their position that 'as between London and BCS, ISI's failures lie with BCS, not London.'" (Resp. 10). Guy Carpenter argues that BCS became aware of its injury in 1998, when the London-Based reinsurers sought a "hold harmless" agreement from BCS. (Mot. 5). In its response to Guy Carpenter's statement of facts, BCS states that "[t]he purpose the Proposed Assignment and Hold Harmless was to protect BCS from potential litigation by Deutsche Financial Services related to the transfer . . . of certain auto warranty business from ISI to a new administrator." (P's Resp. D's SOF Par. 37). However, the memorandum that BCS cites in support of this assertion, written by BCS, states that "BCS will assign to the reinsurers BCS' rights to any and all causes of action it has against ISI relating to ISI's administration of any business that was reinsured by

the reinsurers." (P's Resp. D's SOF Ex. 18). The memorandum further states that "[i]n exchange, the reinsurers would agree to hold harmless BCS from all liability for losses, damages, etc., that have resulted from ISI's administration of such business." (P's Resp. D's SOF Ex. 18). Additionally, Doug MacLean, an executive at BCS, testified in response to deposition testimony regarding the hold harmless agreement that the purpose of the agreement was to ensure that the London-based reinsurers "wouldn't have to go against us in order to get at ISI's what they viewed as bad administration, I guess, of the claims." (D's SOF Ex. 28, Pg. 194). In light of the BCS's memorandum and the testimony by a BCS executive regarding the hold harmless agreement, it is clear that BCS was placed on notice by June 5, 1998, the date of the memorandum, that there were potential problems with the ISI program and that BCS could be held liable for them by the London-based reinsurers. There would be no logical reason for BCS to seek a hold harmless agreement if, as they claim, they had no reason whatsoever to think that they could be held liable for ISI.

Based on the above, we agree with Guy Carpenter that the discussions surrounding the hold harmless agreement between BCS and the London-based reinsurers should have been reasonably sufficient for BCS to have concerns about ISI's actions and BCS's liability for them. Accordingly, we find that, under the discovery rule, the statute of limitations began to run on BCS's fiduciary duty claim no later than June 5, 1998, which is more than two years before the tolling agreement between BCS and Guy Carpenter was signed. Accordingly, we find that Counts I-III

and V-VI are all barred by the statute of limitations under Section 13-214.4.

Therefore, we grant Guy Carpenter's motion for summary judgment on Counts I-III

and V-VI.


## II. Implied Indemnity Claim (Count IV)

BCS has also brought a count alleging that "Guy Carpenter is required to

indemnify BCS for the fees, costs and losses [relating to the arbitration panel's

decision] because of [Guy Carpenter's] special agency relationship with BCS."

(Compl. Par. 67). Since the tolling agreement between BCS and Guy Carpenter was

executed in February 2001, before the arbitration in question in Count IV, the two-

year statute of limitations does not apply to this claim.

Under Illinois law, the doctrine of implied immunity is applied in situations in

which " the indemnitee, although without fault in fact, has been subjected to liability

solely because of the legal relationship with the plaintiff or a nondelegable duty

arising out of common or statutory law." *Frazer v. A.F. Munsterman, Inc.*, 527

N.E.2d 1248,1251-52 (Ill. 1998). Such indemnity typically arises in situations where

a principal is held liable only based on the doctrine of respondeat superior or, for

example, situations where "a landowner [who is] held responsible for failure to

perform the duty imposed by law to maintain his premises in a reasonably safe

condition is allowed indemnity from the negligent party who created the dangerous

condition." *Id.* The courts have also made it clear that "[a] claim of implied

15

indemnity under Illinois law arises only where the indemnitee . . . was guiltless with respect to the underlying tort." *Mizuho Corp. Bank v. Cory & Associates, Inc.*, 341 F.3d 644, 652-53 (7th Cir. 2003).

In the instant action, BCS has not established that its liability to the London-based reinsurers as determined by the arbitration panel was based solely on its legal relationship with Guy Carpenter. In its response to paragraph 57 of Guy Carpenter's Local Rule 56.1 statement of facts, BCS unequivocally admits that it sent a letter to ISI on January 8, 2003, which stated that "the legal issue that the arbitrators ultimately rested their decision on was whether ISI was the agent of BCS and, thus, whether BCS was legally liable for the actions of ISI." (P's Resp. D's SOF Par. 57). BCS also admits that it sent a letter to Guy Carpenter on January 13, 2003, which stated that "BCS maintains that all of the liability it has incurred in connection with the ISI matter is the direct responsibility of [Guy Carpenter] for failing to adequately secure reinsurance coverage and treaties that adequately protected BCS." (P's Resp. D's SOF Par. 58). In the arbitration panel's decision, the panel stated that "[t]he [London-based reinsurers'] request for relief relating to ISI's payment of uncovered claims, late reported claims, unreported premiums and lost investment income is granted . . . ." (P's Resp. D's SOF Ex. 32). It may be true that BCS could have been better protected from the negligence of ISI, which BCS admits was its agent, if Guy Carpenter had secured reinsurance for the ISI program differently. However, BCS has provided nothing to show that it was held *derivatively* liable in the arbitration for

Guy Carpenter's actions. Instead, BCS itself admitted in its January 8, 2003, letter that it was held liable by the arbitration panel because it was ISI's principal. In other words, BCS was not held liable for Guy Carpenter's negligence, but rather BCS was held liable for ISI's negligence. Therefore, we grant Guy Carpenter's motion for summary judgment on Count IV.

## CONCLUSION

Based on foregoing analysis, we grant Guy Carpenter's motion for summary judgment in its entirety and deny BCS's motion for summary judgment in its entirety.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: December 8, 2005